UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

OXFORD HOUSE, INC., ET AL

                                  CIVIL ACTION

VERSUS

                                  NO. 11-391-JJB

CITY OF BATON ROUGE, LOUISIANA

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on cross-motions for summary judgment filed by

Plaintiffs Oxford House, Inc., Danjean Causeway LLC, and Raymond and Glenda Roy

(collectively "Oxford House") (Doc. 82) and Defendant City of Baton Rouge ("City") (Doc. 88).

Defendants have filed an opposition to Plaintiffs' motion (Doc. 100), to which Plaintiffs have

filed a reply. (Doc. 108). Plaintiffs have filed an opposition to Defendants' motion (Doc. 99), to

which Defendants have filed a reply. (Doc. 109). Oral argument is not necessary. For the reasons

herein, the Court GRANTS the Plaintiffs' Motion for Summary Judgment, except for the

Plaintiffs' Section 1983 claim (Doc. 82) and DENIES the Defendants' Motion for Summary

Judgment. (Doc. 88).

I.

Oxford House filed this action, alleging that the City violated the Fair Housing Act, 42

U.S.C. § 3601, *et seq.* ("FHA"), the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*

("ADA"), and Oxford House's civil rights under 42 U.S.C. § 1983. Oxford House alleges that

the City violated the FHA by using and enforcing discriminatory zoning ordinances to exclude

Oxford House from operating in an area zoned for single-family use and retaliating against

Oxford House for exercising their rights under the FHA. (Doc. 47). Oxford House further alleges

that the City violated the ADA by discriminating against Oxford House because of a disability.

1

Finally, Oxford House alleges violations of their constitutional rights under 42 U.S.C. § 1983, alleging that the City used its zoning code and ordinances to discriminate against Oxford House on the basis of a handicap and denying Oxford House due process by applying its code enforcement provisions in an arbitrary and irrational manner.

Oxford House is a national program that supports the opening of individual Oxford Houses throughout the United States. Individual Oxford Houses are designed to create a supportive familial atmosphere to help their residents recover from alcohol and substance addiction. Each house is financially self-supporting, democratically run, and will evict any resident who returns to alcohol or substance abuse. The houses do not have state licenses or a permanent staff. In order to become a resident, prospective residents must complete an application and interview with the current residents of the House to which the prospective resident is applying. After the interview, the current residents vote to decide whether to accept the prospective resident.

Oxford House operates seventeen homes in Baton Rouge, Louisiana.[1] Two of these houses, Oxford House-Drusilla and Oxford House-Shawn, are the subjects of this litigation. Plaintiff Danjean Causeway, LLC owns Oxford House-Drusilla and Plaintiffs Glenda and Raymond Roy own Oxford House-Shawn. Both houses are located in an area of Baton Rouge zoned A-1, which is for single family use. According to the Baton Rouge's Unified Development Code ("UDC"), "family" is defined as an individual or two or more related persons living together or no more than two unrelated people living together, unless the owner lives on the premises, in which case, four unrelated people may live together. (Pt. Ex. HH).

---

[1] According to Oxford House Louisiana's website, there are seventeen group homes in Baton Rouge. OXFORD HOUSE OF LOUISIANA, http://www.ohola.org (last visited Mar. 4, 2013).

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 2 of 33

On February 2, 2011, the City sent a letter to Oxford House-Drusilla, notifying Danjean Causeway that the property was in violation of the UDC because more than two unrelated persons lived there. On February 4, 2011, counsel for Plaintiffs responded, asking for a reasonable accommodation, and asking that the Defendants treat the House as if it were a single family because the residents of the House are the "functional equivalent" of a family and waive the two-person rule as it applies to the House. In the request, Oxford House notified the City that the residents are recovering alcoholics and drug addicts, who are considered handicapped under the FHA. (Pt. Ex. T). In response, the City directed Oxford House to file the request with the Planning Commission. (Pt. Ex. V). Oxford House submitted the same request to the Planning Commission as it did to the City. (Pt. Ex. W). The Planning Commission informed Oxford House to complete a form for a reasonable accommodation located on their website. (Pt. Ex. X). On March 17, 2011, the City filed suit against Danjean Causeway in state court for violating the UDC by having more than two unrelated persons living in an A-1 zone.

On March 23, 2011, Oxford House completed the form, identifying the residents as "handicapped" under the FHA. (Pt. Ex. Z). The form, Reasonable Accommodation for a Group Home, defines a group home as a building where "developmentally disabled persons are housed under the direct care of responsible adult persons on a twenty-four hour basis. . . ." (Doc. 47, ¶ 32) (hereinafter referred to as the "A-9 form"). On April 7, 2011, the City denied the reasonable accommodation request, explaining that the form was incomplete because there was no state license and no 24-hour supervision. (Pt. Ex. CC). Oxford House requested reconsideration, asking the City to waive the licensing requirement, the 24-hour staffing requirement and to treat the home not as a Special Home, but as a family. (Pt. Ex. QQQ). There is nothing in the record indicating that the City responded to this reconsideration.

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 3 of 33

On June 2, 2011, the City sent a follow-up letter to Oxford House, stating that "the unsupported statements of counsel for a party are not evidence of the qualifications for accommodation under the [FHA], and are not evidence of the reasonableness of a proposed accommodation." (Pt. Ex. DD). The City offered suggestions as to how Oxford House could achieve its goal: (1) placing the residence in an A-3 zoning area; (2) Oxford House could explain how it intends to confirm the handicapped status; (3) Oxford House could seek spot rezoning through the UDC; (4) the UDC can designate a building or group of buildings as a PUD, SPUD, or ISPUD; (5) the Zoning Commission could try to amend the definitions if Oxford House requested such an amendment; and (6) the Metro Council could vote to waive the provisions. (Pt. Ex. DD, at 3-4).

A similar pattern transpired with respect to Oxford House-Shawn, with Oxford House writing a letter to the City and the Planning Commission informing Oxford House to complete the reasonable accommodation form. However, Oxford House asked the Planning Commission whether the reasonable accommodation would be rejected because Oxford House-Shawn was not licensed by the State nor did it provide 24-hour staffing. (Pt. Ex. BB).

## II.

*Fair Housing Act and the Americans with Disabilities Act*

The FHA "is worded as a broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individuals." *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir. 1995). The FHA makes it unlawful to discriminate "against any person in the terms, conditions, or privileges of sale or rental of dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap. . . ." 42 U.S.C. § 3604(f)(1). Discrimination includes "a refusal to make reasonable accommodations in rules, policies,

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 4 of 33

practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Under the FHA, a handicap is defined as "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h). However, "such term does not include current, illegal use of or addiction to a controlled substance." *Id.*

Similarly, the ADA is a "broad mandate of comprehensive character and sweeping purpose intended to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life." *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (quotation marks omitted)). Under the ADA, a disability is defined in the same way that the FHA defines a handicap. A disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Under the ADA, major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2).

Oxford House argues that recovering alcoholics and drug addicts are considered disabled and/or impaired under the statutes, and thus, are entitled to the protections afforded by the FHA and the ADA. The City argues that alcoholism and drug addiction are not disabilities *per se*, and a showing that alcoholism and/or drug addiction substantially limits a major life activity is required to prove a disability, relying on the now overturned *Toyota Motor Manuf., Kentucky,*

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 5 of 33

*Inc. v. Williams*, 534 U.S. 184 (2002)[2]. *Toyota* was overturned due to legislative action in U.S. Pub.L. 110-325 in 2009. Congress explained that the purpose of the amendments, in part, was "to reject the standards enunciated in [*Toyota*], that the terms 'substantially' and 'major' in the definition of disability under the ADA 'need to be interpreted strictly to create a demanding standard for qualifying as disabled[.]" U.S. Pub.L. 110-325, Section (b), ¶ 4. Thus, while the Court finds that the strict standard of *Toyota* has been overturned, the requirement of a case-by-case evaluation is still necessary. "[A] *per se* rule is appropriate in these circumstances where the court's obligation is to do a case-by-case evaluation to determine if an individual is handicapped." *Jeffrey O. v. City of Boca Raton*, 511 F.Supp.2d 1339, 1347 (S.D. Fla. 2007). *See also Burch v. Coca-Cola Co.*, 119 F.3d 305, 316 (5th Cir. 1997) (declining to categorize "alcoholism as a per se disability").

Therefore, this Court concludes that there is no *per se* rule that categorizes recovering alcoholics and drug addicts as disabled or handicapped, and a case-by-case evaluation is necessary. Alcoholism and drug addictions are impairments. *Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 46 (2d Cir. 2002) (cataloging cases in which courts have found that alcoholism and drug addiction are impairments). As the Second Circuit noted, the legislative history of the ADA also indicates that Congress intended for alcoholism and drug addiction to be impairments under the Act. *See H.R.Rep. No. 101-485(II)*, at 51 (1990).

---

[2] In *Toyota*, the Supreme Court explained that under the ADA, a disability is a "physical or mental impairment that substantially limits one or more major life activities," but the ADA did not specify what constituted a substantial limitation in a major life activity. 534 U.S. at 196. The Supreme Court found that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled," and held that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.* at 197-98. The Court also noted that "the existence of a disability [is] to be determined in such a case-by-case manner." *Id.* at 198.

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 6 of 33

However, the Second Circuit explained that "mere status as an alcoholic or substance abuser does not necessarily imply a 'limitation' under the second part of that definition." *RECAP*, 294 F.3d at 47. Although the Second Circuit cited the now-overturned *Toyota* case in finding that the clients in *RECAP* were substantially limited, the Second Circuit concluded that the requirements to enter into a halfway house, the subject of the litigation, were sufficient to establish that the residents' impairments substantially limited their lives. *See id. See also U.S. v. Borough of Audubon, N.J.*, 797 F.Supp. 353 (D. N.J. 1991) (finding that testimony of the residents demonstrated that their handicap, drug addiction and/or alcoholism, substantially limited major life activities).

Here, the Court finds that the affidavits of the residents and the testimony presented at the preliminary injunction hearing establishes that the residents of Oxford Houses have a handicap and/or a disability that substantially limits their major life activities. One resident testified that "alcoholics, drug addicts, we do not know how to live," and that living in Oxford House teaches them "to become accountable [and] productive members of society." (Tr., p. 67). She explained that she is unable to live with her parents because her parents do not trust her, and her parents drink regularly and take prescription medications. (Tr., p. 69-70). She surmised that if Oxford House were to close, she "will be on the street" and "then back in jail." (Tr., p. 71). Thus, the residents of the Oxford Houses are disabled and/or handicapped for the purposes of the FHA and ADA, and the protections of the statutes apply.

III.

There are three (3) possible theories of discrimination for an alleged violation of either the FHA or the ADA: disparate treatment, disparate impact, and failure to make a reasonable accommodation. *See RECAP*, 294 F.3d at 48; *see also Smith & Lee Associates, Inc. v. City of*

7

*Taylor, Mich.*, 102 F.3d 781, 790 (6th Cir. 1996). Oxford House seeks summary judgment on the theories of failure to make a reasonable accommodation and disparate treatment. Oxford House also seeks summary judgment on the grounds that the "Special Homes" ordinance is facially discriminatory and violates the FHA and ADA on its face and that the City retaliated against it for filing a complaint with HUD and this suit. The City seeks summary judgment on the theory that the City was not on notice of the disability status of the residents of Oxford House, Oxford House is unable to prove discriminatory animus, the requested accommodation was not reasonable, Oxford House is unable to prove discriminatory effect of the "Special Homes" provision, any arbitrary decisions by the City, and retaliation. Moreover, the City raises an affirmative defense of reliance on prior rulings, which the City asserts would bar recovery by Oxford House. The Court will address these arguments under the appropriate theories of recovery.

<u>Reasonable Accommodation</u>

Under the UDC, reasonable accommodations are encompassed in the definition of "Special Homes. The definition of "Special Homes" is bifurcated. The first portion of the definition defines "Special Homes" as:

> buildings, other than institutions, operated by a person or persons, society, agency, corporation, institution or group licensed by the State wherein developmentally disabled persons are housed under the direct care of responsible adult persons on a twenty-four-hour basis to assure that a responsible adult is on premises at all times in case of emergency; and such buildings and premises shall meet all city-parish building codes, fire codes and zoning ordinance requirements and state fire marshal requirements prior to the issuance of any State permits for occupancy and/or operation.

(Pt. Ex. HH at 25). The second portion of the definition provides that:

> Special homes for the handicapped (within the federal Fair Housing Act definition of "handicapped") are permitted uses in all

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 8 of 33

residential zones where they are not permitted as of right, notwithstanding any zoning requirements inconsistent therewith, in all cases where granting permission for such use would be a "reasonable accommodation under the federal Fair Housing Act. A permit for such use will be granted by the City-Parish along with any provisions of the zoning ordinance that would otherwise prohibit such use will not be enforced, provided that the requested accommodation is reasonable. In determining whether a request for such a permit is reasonable, the City-Parish will consider the following:

A. Whether the proposed special home for the handicapped would cause a "fundamental change," as interpreted by applicable decisions construing the federal Fair Housing Act in the City-Parish's zoning;

B. Whether the proposed facility's violation of otherwise applicable zoning rules is "necessary," because of:
    1. The economics of its operation,
    2. The need for residential opportunities for handicapped persons, or
    3. Any other reason constituting "necessity" under applicable federal law; and

C. Whether the proposed facility would cause any undue financial or administrative burden on the City-Parish.

Parties seeking a reasonable accommodation must submit to the City-Parish Planning Commission staff information addressing these issues on forms supplied by the City-Parish.

(*Id.*)

Oxford House asserts that the City violated the ADA and FHA by refusing to grant its reasonable accommodation request. The FHA defines discrimination as a "refusal to make reasonable accommodations . . ., when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The Court finds that the best approach to determine whether the City failed to make a reasonable accommodation is to adopt the approach utilized by the Eleventh Circuit in *Schwarz v. City of Treasure Island*, 544 F.3d 1201 (11th Cir. 2008). There, the Eleventh Circuit analyzed a

9

reasonable accommodation by addressing the three elements of the FHA statute: refusal, reasonableness, and necessity. *Id.* at 1218-19.

Refusal

Refusal requires a showing that a plaintiff requested an accommodation and the defendant refused it. *Id.* at 1219. A plaintiff "must first provide the governmental entity an opportunity to accommodate them through the entity's established procedures used." *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 578 (2d Cir. 2003). Failing to make a request "is fatal to [a] reasonable accommodation claim." *Oxford House-C v. City of St. Louis*, 77 F.3d 249, 253 (8th Cir. 1996). However, if making a request would be clearly futile or "foredoomed," then the plaintiff is not required to make such a request. *United States v. Village of Palatine*, 37 F.3d 1230, 1234 (7th Cir. 1994).

Here, the evidence in the record is conflicting as to what the City's established procedures actually are. Lea Anne Batson, Special Assistant Parish Attorney, testified that there is "no other specified procedure" other than completing the A-9 form, but "we would entertain other reasonable accommodation requests." (Df. Ex. R. at 38-39). For a group home that is unlicensed, Ms. Batson explained that while there may not be a specific form, "[t]hat doesn't mean they wouldn't be entitled to request one. They can write it on a napkin and submit it. There are no formality requirements under the Fair Housing Act." (Df. Ex. R. at 68).

The Court finds that the record overwhelmingly shows that Oxford House made multiple reasonable accommodation requests, both directed to the Parish Attorney's Office and the Planning Commission, and upon advice of the City, Oxford House completed the A-9 form for Oxford House-Drusilla. The City denied the request, stating that the form was incomplete because there was no evidence of a license or 24-hour supervision. Oxford House requested that

10

the City reconsider, explaining that it was not attempting to run a Special Home, but that it was attempting to be treated as a family. While the City did not respond to this request, the City did send a follow-up letter, explaining that "the unsupported statements of counsel for a party are not evidence of the qualifications for accommodation under the [FHA], and are not evidence of the reasonableness of a proposed accommodation." (Pt. Ex. DD). The City offered alternative suggestions as to how Oxford House could achieve its goal by other means, such as relocating to a different zoning area.

Although Oxford House did not complete the A-9 form for Oxford House-Shawn, it did send the same letters explaining its request for reasonable accommodation as it did for Oxford House-Drusilla. Oxford House did ask the Planning Commission whether the reasonable accommodation request would be rejected because Oxford House-Shawn was not licensed nor did it provide 24-hour staffing. (Pt. Ex. BB). Because the City refused its request for a reasonable accommodation for Oxford House-Drusilla, and the reasonable accommodation request for Oxford House-Shawn was identical, it would have been futile to complete the A-9 form. *See Palatine*, 37 F.3d at 1234 (finding that a plaintiff "need not resort to [the City's procedures] if such resort is manifestly futile" and the City "must be afforded an opportunity to make such an accommodation pursuant to its own lawful procedures – unless it is clear that the result of such procedures is foredoomed.").

The City incorrectly asserts that Oxford House was required by law to continue seeking accommodation and that Oxford House chose to ignore the alternatives that the City presented, which the City asserts would allow the two Houses to "operate legally in the current zoning by means other than 'reasonable accommodation.'" (Doc. 100 at 12). The City cites *Oxford House-C*, noting that the Eighth Circuit stated that the "Oxford Houses must give the City a chance to

11

accommodate them through the City's established procedures for adjusting the zoning code."
*Oxford House-C*, 77 F.3d at 253. Presumably, the City is suggesting that Oxford House should give the City the same chance to accommodate them by availing themselves of one of the suggested legal alternatives, including adjusting the zoning code. However, in *Oxford House-C*, the only established procedure available was to apply for a variance, and the Oxford House refused to do so. Here, while the established procedure available is unclear, because it could range from filling out the request on a napkin to completing the A-9 form, it is clear that Oxford House requested the reasonable accommodation multiple times and completed the A-9 form for Oxford House-Drusilla at the direction of the City.

Thus, the City refused the reasonable accommodation requests for both Oxford House-Drusilla and Oxford House-Shawn.

Reasonableness

An accommodation is reasonable if it "does not cause any undue hardship or fiscal or administrative burdens on the municipality, or does not undermine the basic purpose that the zoning ordinance seeks to achieve." *Oxford House, Inc. v. Town of Babylon*, 819 F. Supp 1179, 1186 (E.D. N.Y. 1993). *See also Oxford House, Inc. v. Township of Cherry Hill*, 799 F. Supp. 450, 461 (D.N.J. 1992) (noting that an accommodation is unreasonable if it "either imposes undue financial and administrative burdens . . . or requires a fundamental alteration in the nature of the program[.]" (internal citations and quotations omitted)).

Oxford House argues that there is no evidence showing that either Oxford House fundamentally alters the zoning scheme or causes an undue financial or administrative burden on the City. Oxford House contends that there were no noise, traffic, or crime related complaints made about either house. The City argues that Oxford House's proposed accommodations impact

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 12 of 33

the City's zoning scheme and that the City has received complaints concerning noise and traffic. The City asserts that the structure of Oxford Houses defeat the purpose of zoning an area for single family residences because Oxford Houses do not impose time limits on a resident's stay, and a resident can be evicted at any time, which demonstrates the transient nature of Oxford Houses. The City asserts that the purpose of zoning an area for single family residence is to provide stability and permanence and to preserve "the character of neighborhoods, securing 'zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people.'" *City of Edmonds v. Oxford House, Inc*., 514 U.S. 725, 732-33 (1994) (quoting *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9 (1974)).

Because neither party argues that the accommodation would impose an undue financial burden or an administrative hardship on the City, and the Court does not find anything in the record that would support such a finding, the Court will not address this prong. Turning to the second prong, which is whether the requested accommodation would fundamentally alter the zoning scheme, the Court finds that the complaints that have been made about the Oxford Houses do not rise to the level of fundamentally altering the zoning scheme.

According to deposition testimony, with respect to Oxford House-Drusilla, there were complaints about too many people living there (Pt. Ex. EE at 58; Pt. Ex. FF at 18) and complaints about increased traffic and vehicles in the area. (Pt. Ex. FF at 18, 54). Moreover, there were general complaints about the house being "illegal" and "ruin[ing] the older neighborhoods of Baton Rouge[.]" (Pt. Ex. FF at 45). Additionally, the City put forth evidence of select e-mails from citizens complaining about the number of cars parked on the street, illegal parking concerns, and dangerous traffic conditions at Oxford House-Drusilla. (Df. Ex. AA). However, the Court notes that the property next door to Oxford House-Drusilla houses college

students and the neighbors also complained about the cars and parking problems associated with that property. (Df. Ex. AA).

With respect to Oxford House-Shawn, there was a complaint by a neighbor about the presence of a "halfway house" in the neighborhood and "people coming and going from the house." (Pt. Ex. EE. at 80). However, there is no evidence in the record that there were complaints about noise or traffic at Oxford House-Shawn. Because the only objection in the record about Oxford House-Shawn is that it was a "halfway house," the Court finds that this should not be considered in determining whether the requested accommodation would "effect a fundamental change in the neighborhood." *Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 462 (D.N.J. 1992)[3].

Here, the Court finds that the proposed use of the Oxford Houses is similar to the uses already permitted by the zoning code. *See Schwarz*, 544 F.3d at 1221 (explaining that "if the proposed use is quite similar to surrounding uses expressly permitted by the zoning code, it will be more difficult to show that a waiver of the rule would cause a 'fundamental alteration' of the zoning scheme."). The goal of the Oxford Houses is to create a supportive, family environment and to treat the residents of the Oxford House as a functional family. There is no evidence, absent a few e-mails and testimony concerning increased traffic and parking concerns relating to Oxford House-Drusilla, that either Oxford House would fundamentally alter the zoning scheme of the neighborhood. Thus, the requested accommodation was reasonable.

---

[3] In *Oxford House, Inc. v. Township of Cherry Hill*, the court explained that "the fact that citizens may vociferously oppose the establishment of a home for handicapped people in their neighborhood can hardly be cited as a legitimate justification for discriminatory treatment of the handicapped." 799 F.Supp. 450 at 463, n. 26.

14

<u>Necessity</u>

The final prong to consider is whether the requested accommodation "may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). This requirement is divided into two considerations: is the accommodation necessary and will the accommodation afford equal opportunity to the disabled? In order for a requested accommodation to be necessary, the plaintiff must show "a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided to the handicapped person." *Bryant Woods Inn, Inc. v. Howard County, Md.*, 124 F.3d 597, 604 (4th Cir. 1997). If the requested accommodation "provides no direct amelioration of a disability's effect," it is not necessary. *Id.* With respect to the "equal opportunity" requirement, the FHA "does not require accommodations that increase a benefit to a handicapped person above that provided to a nonhandicapped person with respect to matters unrelated to the handicap." *Id.*

Here, Oxford House asserts that the requested accommodation is necessary because the residents of Oxford Houses benefit from living with other people who are recovering from alcoholism and drug addiction. The City contends that the suggested ameliorative effects of this accommodation request were too vague. The Court finds that there is sufficient evidence in the record to show that this type of living arrangement has an ameliorative effect on the residents' disability/handicap. The affidavits of the residents show that prior to living in Oxford House, their prospects for recovery were bleak and the residents were unable to function. However, after moving into Oxford House, the residents are able to care for themselves, hold employment, and pay bills. The residents all stated that the supportive structure of Oxford House has enabled them to turn their lives around. (Pt. Ex. P, Q, and R). Thus, the requested accommodation "may be necessary" under the FHA.

Oxford House has also shown that the requested accommodation may be necessary for equal opportunity because "a modification of the definition of a 'family' . . . is warranted so that [Oxford house] may have the same opportunity to rent a house as do persons without handicaps." *Babylon*, 819 F. Supp. at 1185. In *Babylon*, the court explained that the city's zoning ordinance would not permit Oxford House to rent a house in "any residential neighborhood," and thus, there was no other option for Oxford House. *Id.* at n. 10. However, the court explained that "even if this were not the case, defendant would nevertheless be required to make an accommodation in its Code permitting plaintiffs to occupy *this* house." *Id.* (emphasis in original). The law "dictates that a handicapped individual must be allowed to enjoy a *particular* dwelling, not just some dwelling somewhere in the town." *Id.* (emphasis in original). The Court finds that reasoning instructive and concludes that this requested accommodation "may be necessary" to afford "equal opportunity."

The City Violated the FHA by Refusing to Grant a Reasonable Accommodation

Thus, the Court finds that the City violated the FHA by refusing to grant a reasonable accommodation. The City's letter explained that the accommodation was not granted because the Oxford House was not licensed and did not have 24-hour staffing. (Pt. Ex. CC). However, as Ms. Batson explained, and the Court agrees, that the definition of "Special Homes" is bifurcated. The first portion of the definition encompasses facilities that provide services to the developmentally disabled and that are licensed and staffed on a 24-hour basis. (Pt. Ex. HH). It is clear from the record that Oxford Houses do not meet this definition. However, Ms. Batson explained that homes "that require reasonable accommodation" are the ones "that doesn't necessarily meet this definition of special home." (Df. Ex. R. at 37).

Thus, the letters that counsel for Oxford House sent to the Parish Attorney's office clearly constitute a request for reasonable accommodation as envisioned by the second portion of the definition of "Special Homes." The City asserts that "Oxford House applies for a reasonable accommodation, was told that it was not a Special Home, and that it had not provided enough information to justify a reasonable accommodation under the second clause." (Doc. 100 at 17). In the letter denying the request, there was no evidence that the City told Oxford House that the reason it denied the request was because it did not have enough information to justify an accommodation under the second clause. Rather, the only information that the City provided in support of its denial is that Oxford House did not have enough information to justify an accommodation under the *first* clause. Therefore, it appears that the City not only violated the FHA by refusing the grant the reasonable accommodation, the City also did not explain adequately why the reasonable accommodation was denied.

As a final matter, although an agency's findings are not binding, they are persuasive. The Court finds it instructive and persuasive that the Department of Housing and Urban Development ("HUD") found that the City violated the FHA by denying Oxford House's reasonable accommodation request. HUD explained that:

> The evidence collected during the course of the subject investigation indicates that the City of Baton Rouge, East Baton Rouge Parish has violated the Fair Housing Act by denying Oxford House Inc.'s request for reasonable accommodation. The evidence shows that the Complainant's reasonable accommodation request did not receive any substantive consideration by Respondent. The evidence shows that the requested accommodation does not constitute an undue financial or administrative burden or a fundamental alteration to the nature of City-Parish programs, and therefore should have been granted.

(Doc. 99-18, *Letter from HUD*, June 26, 2012). The Court agrees with the HUD's assessment and concludes that the City violated the FHA by denying the request for reasonable accommodation.

IV.

Disparate Treatment

Oxford House asserts that the City intentionally discriminated against it and that the "Special Homes" ordinance is facially discriminatory. To prove intentional discrimination, Oxford House must demonstrate "that a motivating factor behind the City's refusal to classify [Oxford House] as a single family household was the residents' status as recovering drug addicts and alcoholics." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 579-80 (2d Cir. 2003) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-66 (1977)). When examining a claim of intentional discrimination, courts consider: (1) the discriminatory impact of the decision; (2) the decision's historical background; (3) the sequence of events leading up to the decision; (4) any departures from the normal procedure; and (5) the legislative or administrative history. *Arlington Heights*, 429 U.S. at 266-68.

Oxford House asserts that the City has a history of discriminating against persons with disabilities, as evidenced by the Middle District of Louisiana's decision in *Allied Health Care, Inc. v. City of Baton Rouge*. There, the plaintiffs were operating a group home for developmentally disabled individuals in an A-1 zoning area, and the home had a license and 24-hour staff. (Pt. Ex. GG). There was opposition to the home, which was motivated, in part, by the fact that the residents were disabled. The court found that there was intentional discrimination by the city because the "city officials responded to the presence of the Home based on stereotypical fears, and carried out their enforcement efforts in response to neighborhood and

18

community fears." (Pt. Ex. GG at 9). The court further found that the zoning ordinance at the time had a discriminatory impact on the disabled because the ordinance only permitted community homes in high-density residential areas, but not single-family zones. Oxford House argues that this is evidence of legislative or administrative history that would support a finding of discriminatory intent under the *Arlington Heights* factors.

Additionally, Oxford House asserts that the "Special Home" definition and the City's reasonable accommodation process are facially discriminatory. Oxford House focuses on the first portion of the definition, which provides that special homes are buildings where developmentally disabled individuals live under the "direct care of a responsible persons on a twenty-four-hour basis to assure that a responsible adult is on premises at all times in case of emergency." (Pt. Ex. HH). Oxford House argues that this is facially discriminatory because (1) it classifies based on disability; (2) it imposes burdensome and illegal conditions that are not "tailored towards the individual needs of the inhabitants" (Doc. 82-1 at 23); and (3) it only applies to developmentally disabled individuals. Oxford House contends that this ordinance has a discriminatory impact on disabled individuals who are recovering from alcoholism and/or drug addiction.

The City argues that the "Special Home" provision is not facially discriminatory, and Oxford House only focuses on the first portion of the definition, and ignores the second portion, which mirrors the requirements under the FHA. The City argues that the first paragraph of the "Special Homes" provision is a "streamlined mechanism for group homes and facilities," but anybody can request a reasonable accommodation even if the proposed accommodation does not have a license or a 24-hour staff.

The City further argues that a facially discriminatory ordinance "imposes a burden on a protected group which is not imposed on a non-protected group." (Doc. 100 at 18). The City

19

asserts that while the first portion of the definition "appears to grant a special privilege to the developmentally disabled," there is no evidence that this provision has been limited to just the developmentally disabled and there is no evidence that this provision has been enforced in a discriminatory fashion. According to the deposition testimony of Collin Magee, the land use and zoning coordinator with the City Parish Planning Commission, although the form for reasonable accommodations requires applicants to list the developmental disability of the residents, the Commission does not require that the residents have a developmental disability. (Df. Ex. W). If there are no developmental disabilities listed, the application is still sent the Parish Attorney's office for review and the Commission "would inform the applicant that this information needs to be furnished in order for the reasonable accommodation request to be granted." (Df. Ex. W. at 21-22). However, Ms. Batson testified that "[a]nyone can request a reasonable accommodation for any reason which will be evaluated under the requirements of the ADA and the FHA . . . to determine whether or not it should be granted." (Pt. Ex. U. at 45-46).

The Court finds that the first portion of the ordinance defining "Special Homes" is facially discriminatory for the reasons that Oxford House states. In *Marbrunak, Inc. v. City of Stow, Ohio*, the Sixth Circuit found that an ordinance which imposed "onerous safety and permit requirements on single-family residences occupied by developmentally disabled persons," when these requirements were not imposed on any other single-family residences violated the FHA. *Marbrunak, Inc. v. City of Stow, Ohio*, 974 F.2d 43, 46-47 (6th Cir. 1992). While a city is permitted to "impose standards which are different from those to which it subjects the general population," the city must show that the "protection is demonstrated to be warranted by the unique and specific needs and abilities of those handicapped persons." *Id.* at 47. The City's argument that this provision is merely a "streamlined provision" for a reasonable accommodation

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 20 of 33

and that this provision is available for any disabled person who meets the criteria does not help overcome the fact that there is a lack of tailoring to the individual needs. Rather, this provision grants a blanket reasonable accommodation for group homes that are licensed and staffed on a 24-hour basis, regardless of the needs of the individuals in the group home. Applicants wishing to operate a group home that is not licensed or staffed on a 24-hour basis must take an additional step, which is to comply with the second half of the provision, by showing that the requested accommodation is reasonable and necessary. This is not to say that this should not be required because the second portion of the ordinance is what federal law requires. However, group homes that are licensed and staffed on a 24-hour basis do not need to show that the requested accommodation is reasonable and necessary, which the Court finds impermissible.

Moreover, the Court finds the evidence in the record to be conflicting as to the City's position that anybody can get a reasonable accommodation regardless of the disability. On one hand, Ms. Batson testified that anybody can request a reasonable accommodation and that a particular format is not necessary. Oxford House did just that. It submitted a request for a reasonable accommodation to both the Parish Attorney's office and to the Planning Commission. Both offices were on notice that the Oxford House would not meet the requirements for a Special Home, yet the Planning Commission directed Oxford House to complete the A-9 form anyway, which requires a showing of licensing and 24-hour staffing. Additionally, Mr. Magee from the Planning Commission testified that an applicant would need to furnish information about the type of developmental disability the residents in the proposed group home have in order for the reasonable accommodation request to be granted. It is unclear how a group home like Oxford House could ever request and receive a reasonable accommodation under the City's formula in

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 21 of 33

the absence of showing licensing or a 24-hour staff. Thus, the Court finds that the first portion of the ordinance is discriminatory, both facially and as applied.

Returning to Oxford House's argument that the City intentionally discriminated against it on the basis of disability status, Oxford House further argues that (1) the City knew that the ordinance was discriminatory, (2) the City was aware of potential FHA violations, (3) the decision makers were influenced by discriminatory animus, and (4) the respective council members for the districts where the Oxford Houses were located influenced the decision makers to deny the reasonable accommodation applications. Oxford House points to a memo written in 2003[4], in which Ms. Batson explained that federal courts have found that allowing "eight or nine disabled persons to reside in a single family district is a reasonable accommodation." (Pt. Ex. NN. At 1). Additionally, the memo explained that imposing special conditions, such as a 24-hour staffing requirements, has been found to be potentially discriminatory by at least one circuit. In 2005, Ms. Batson wrote an additional memo, in which she explained that "recovering alcoholics and drug addicts are considered disabled." (Pt. Ex. OO at 2). Oxford House asserts that this is evidence that the City is aware that reasonable accommodations for recovering drug addicts and alcoholics may be necessary under the FHA and the ADA, yet the City chose to ignore its own advice.

The City argues that Oxford House's references to these memoranda only show that the City is aware of its responsibilities under the FHA and the ADA, and that the City has made every effort to prevent discriminatory practices and to comply with the statutes. The City asserts that these memoranda do not show that the City ignored its own legal advice.

---

[4] Although the memo is dated January 27, 2012, the memo is actually from December 12, 2003. *See Pt. Ex. LLL. at 5.*

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 22 of 33

Oxford House contends that the City denied the reasonable accommodation requests because there was "organized community opposition to the two Oxford Houses," and the respective council members were influenced by discriminatory animus. In support, Oxford House provided copies of e-mails showing that when neighbors found out about Oxford House's intention to open Oxford House-Drusilla, they requested that the city council member shut it down. (Pt. Ex. VV). Cyndi Bohrer, Senior Special Assistant Parish Attorney, explained that until the residents moved in, nothing could be done because there was no actual violation to prosecute. She further explained that any request for a reasonable accommodation would be sent to them, and she would let Councilwoman Alison Gary (formerly Cascio) know if they received one. However, she advised that "when it becomes apparent that a single family use violation is present, my suggestion would be to immediately bring it to Neal's attention so that enforcement proceedings can be instituted without any delay." (Pt. Ex. VV).

Oxford House asserts that Councilwoman Gary became involved in the City's decision to shut down the Houses and deny the reasonable accommodation requests, despite the fact that council members are not supposed to be involved in the reasonable accommodation process. (Pt. Ex. U (first deposition of Councilwoman Gary) & Pt. Ex. EE (second deposition of Councilwoman Gary)). Oxford House contends that this is a departure from the City's normal process of evaluating reasonable accommodation requests, which is evidence of discrimination under the *Arlington Heights* factors. *Arlington Heights*, 429 U.S. at 266-68. In response to an email from a constituent, on January 3, 2011, Councilwoman Gary inquired as to whether Oxford House-Drusilla had applied for a reasonable accommodation, and upon learning that it had not, asked if an inspection could be initiated to get the house into compliance. (Pt. Ex. WW). On March 1, 2011, Councilwoman Gary followed up with the parish attorney's office for an

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 23 of 33

update. (Pt. Ex. FFF). The assistant Parish attorney, Maimuna Magee stated that she had received a letter from Oxford House's counsel, which was "really a request for reasonable accommodation," and explained that she had advised him to contact the Planning Commission. Ms. Magee had heard from the Planning Commission, who informed her that Oxford House's counsel intended to complete the application. Ms. Magee explained that she would give Oxford House two weeks to submit an application before going forward with a violation. (*Id.*) On March 5, 2011, a resident emailed Councilwoman Gary to complain that the city was being "so lenient on this ILLEGAL operation" and inquired as to whether the city was "going to sit back and allow unlicensed homes to ruin the older neighborhoods of Baton Rouge?" (Pt. Ex. ZZ). On March 9, 2011, Councilwoman Gary asked whether Oxford House-Drusilla had filed a reasonable accommodation request. (*Id.*). Ms. Magee advised that Oxford House had not filed its application yet, and she would begin working on filing a suit against them. (*Id.*). Oxford House argues that Ms. Magee had originally intended to give Oxford House two weeks to file the application, but shortened it upon further communications from Councilwoman Gary.

Oxford House further asserts that Councilwoman Gary, through her administrative assistant Rebecca DeLaughter, influenced the City's decision to institute proceedings against Oxford House-Shawn. Although the Department of Public Works, through Neal Bezet, stated that the pictures "we have taken do not indicate a violation," Ms. DeLaughter explained that there were constituent complaints about too many people in the house, and Mr. Bezet advised her to send a violation letter. (Pt. Ex. UU). Oxford House asserts that the Department of Public Works would never have cited Oxford House-Shawn but for the involvement of Councilwoman Gary because as Mr. Bezet explained, there was no evidence of a violation at the house.

In opposition, the City asserts that Councilwoman Gary is not a decision maker[5], and thus, she could not have influenced the actions taken in this litigation. The City contends that the only way that Councilwoman Gary could have influenced the decision with respect to the reasonable accommodation is by speaking at a public hearing, which she did not do. The City acknowledged that a "decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process," but argues that there is no evidence that the "panicky emails of constituents" had any impact on the process by the Planning Commission and the Parish Attorney's Office. *Association of Relatives & Friends of AIDS Patients v. Regulations & Permits Admin.*, 740 F. Supp. 95, 104 (D.P.R. 1990). Moreover, the City argues that Councilwoman Gary was not influenced by discriminatory pressure from her constituents, but even if she had been, she still was unable to influence the process as a whole. Additionally, in the City's own motion for summary judgment, the City argues that there is no discriminatory intent because there was (1) no discriminatory impact, (2) the City was unaware as to what an Oxford House was; (3) the City did not know the residents were disabled; (4) the deposition testimony shows that the representatives of the City denied having any discriminatory intent; and (5) there were no departures from procedure.

The Court finds that the City's protestations unconvincing. The City's arguments with respect to the memoranda and Councilwoman Gary both have the same logical fallacies. The City presumes that just because the City is aware of its responsibilities, it is unable to discriminate and just because Councilwoman Gary is not a decision maker, she is unable to influence the actions of the decision makers. The City has not put forth any evidence to the contrary. Moreover, the City's arguments in support of its own motion also are unsupported by

---

[5] Although the City argues that Councilwoman Gary is not a decision maker in its opposition to Oxford House's motion for summary judgment, the City refers to her as a decision maker in its own motion for summary judgment. "[T]he only decision maker question was Ms. Gary[.]" (Doc. 88-1 at 16).

25

the evidence. The City was aware, or should have been aware, from the multiple letters that counsel for Oxford House sent prior to filling out the A-9 form, what an Oxford House was and that the residents were considered disabled. Moreover, when Oxford House used the A-9 form, Oxford House repeated what the disabilities were and what an Oxford House was. Finally, there is evidence in the record to show that there was a departure from procedure because (1) Councilwoman Gary was involved in finding out what was happening with the reasonable accommodation request and (2) while each reasonable accommodation request is supposed to be evaluated on an individual basis according to the requirements of the second part of the definition of the Special Homes if the home does not meet the criteria for the first portion, there is no evidence that this was done here. Thus, the Court finds that there is sufficient evidence to find discriminatory intent.

## IV.

## Retaliation

Oxford House asserts that the City retaliated against the plaintiffs by citing Plaintiff Danjean Causeway LLC for failing to obtain a certificate of occupancy for Oxford House-Drusilla after Oxford House had filed a complaint with HUD and again after Oxford House filed this suit. Oxford House asserts that under the FHA, it is unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [section 3604]." 42 U.S.C. § 3617[6]. The ADA also contains a similar provision. 42 U.S.C. § 12203.[7]

---

[6] Section 3604 refers to 42 U.S.C. § 3604, which makes it unlawful to discriminate because of a handicap.

[7] " No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

26

Retaliation claims brought pursuant to the FHA and the ADA are analyzed under the same standards used for analyzing retaliation claims brought pursuant to Title VII. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997); *see also Texas v. Crest Asset Management, Inc.*, 85 F. Supp. 2d 733 (S.D. Tex. 2000). To assert a prima facie case of retaliation, a plaintiff must show "(1) he engaged in an activity that [the FHA and ADA] protects; (2) he was subjected to an adverse [action by the defendant]; and (3) a causal connection exists between the protected activity and the adverse . . . action." *LeMaire v. Louisiana Department of Transportation & Development*, 480 F.3d 383, 388 (5th Cir. 2007). Once a plaintiff has made out a prima facie case, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the challenged . . . action." *Grimes v. Texas Dept. of Mental Health & Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996).

A protected activity includes "oppos[ition] [to] any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."42 U.S.C § 12203(a). Here, Oxford House engaged in two protected activities and the City does not dispute that these activities were protected.  First, Oxford House filed a complaint with HUD on May 4, 2011. (Pt. Ex. RRR).  Filing an administrative complaint constitutes a protected activity. *See Drake v. Nicholson*, 324 F. App'x 328, 331 (5th Cir. 1009). Second, Oxford House filed this suit on June 10, 2011. (Doc. 1). Filing a lawsuit also constitutes a protected activity. *See Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 240 (S.D.N.Y. 2005).

Oxford House asserts that the City took adverse action against Oxford House after Oxford House filed its HUD complaint, and again after Oxford House initiated this lawsuit. After Oxford House filed its complaint with HUD on May 4, 2011, the Department of Public Works

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 27 of 33

sent a letter on May 25, 2011, explaining that Oxford House-Drusilla lacked a certificate of occupancy, in violation of the UDC. (Pt. Ex. BBB). The letter provided that the "violation must be removed by June 8, 2011." (*Id.*). Similarly, after Oxford House filed this suit on June 10, 2011, the Parish Attorney's office sent a letter on June 24, 2011, explaining that Oxford House-Drusilla was in violation of the UDC for failure to obtain a certificate of occupancy. (Pt. Ex. AAA). The letter advised that Oxford House had ten days to remedy the violation, or the City would take legal action. (*Id.*).

Oxford House argues that there is a causal connection between engaging in the protected activities of filing an administrative complaint and filing a lawsuit and the sending of the two letters. Oxford House points to a Second Circuit opinion, in which the court found that "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. General Electric Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks and citation omitted). *See also DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (finding that "where the temporal proximity between the protected activity and the adverse . . . action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise.").

In opposition, the City first reiterates its position that the City was unaware of the disability status of the residents to support its conclusion that without knowledge of this disability status, "there can be no violation to form the predicate." (Doc. 100 at 25). However, courts have found that it is not necessary for a plaintiff to establish an underlying claim of discrimination to prevail on a retaliation claim. *See Reyes v. Fairfield Properties*, 661 F.Supp. 2d 249, 265, n.6 (E.D.N.Y. 2009); *see also United States v. Pospisil*, 127 F. Supp. 2d 1059, 1063

(W.D. Mo. 2000) (finding that section 3617 is not solely "limited to violations of sections 3603, 3604, 3605, or 3606.").

Additionally, as Oxford House points out, HUD's regulations indicate that section 3617 is an independent cause of action. Oxford House urges this Court to apply *Chevron* deference and defer to HUD's regulations as a "permissible construction" of the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).[8] The HUD regulations, in defining what conduct is unlawful under section 3617, prohibit"[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons." 24 C.F.R. § 100.400(c)(2). Additionally, the regulations also prohibit "[i]ntimidating or threatening any person because that person is engaging in activities designed to make other persons aware of, or encouraging such other persons to exercise, rights granted or protected by this part," as well as "[r]etaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act." 24 C.F.R. § 100.400(c)(4)-(5). Because the regulations indicate that retaliation for making a complaint under the FHA is unlawful conduct in itself, and there is no requirement that the complainant prove underlying discrimination, the Court finds the City's position is incorrect.

Turning the City's second argument, the City asserts that Oxford House has failed to show the causal connection between the protected activity and the sending of the letters. The city

---

[8] While Oxford House does not explicitly refer to the two pronged analysis under *Chevron*, the Court presumes that Oxford House is arguing that section 3617 is ambiguous, and thus, this Court should defer to HUD's construction of it. *Chevron* provides that reviewing courts have to answer two questions. First, has "Congress directly spoken to the precise question at issue"? *Chevron*, 467 U.S. at 842. If yes, then that is the end of the analysis because the agency and the court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. However, if the "statute is silent or ambiguous," the question becomes whether the agency's interpretation is a "permissible construction of the statute." *Id.* at 843.

29

argues that the letters are attempts to get Plaintiff Danjean Causeway, the owner of Oxford House-Drusilla, in compliance with the UDC's requirement for an occupancy permit. Even if Oxford House-Drusilla had met the licensing and 24-hour supervision requirements for a "Special Home," it still would have been required to obtain an occupancy permit. (Pt. Ex. U. at 39, testimony of Ms. Batson). According to Ms. Bohrer, all residences are required to have a certificate of occupancy. (Df. Ex. P at 129).

The Court finds that the City's argument that Oxford House failed to show the causal connection is unpersuasive. As Oxford House correctly points out, the causal connection can be "established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra*, 252 F.3d at 217 (internal quotation marks and citation omitted). Here, the City took adverse action within two to three weeks after Oxford House engaged in the protected activities of filing the complaint and this suit. The timing of these letters supports finding a causal connection. Thus, Oxford House has established a *prima facie* case, and the City has not argued that it had a "legitimate, nondiscriminatory reason for the challenged . . . action." *Grimes*, 102 F.3d at 140.

The Court does recognize that all residences need a certificate of occupancy, which the City could have argued was its legitimate and nondiscriminatory reason for sending the letters instead of arguing that Oxford House failed to establish the causal connection. However, even if the City had argued this, the Court still does not find that this is a legitimate and nondiscriminatory reason given the history of this suit. The City notified Danjean Causeway that Oxford House-Drusilla was in violation of the UDC because more than two unrelated persons lived there on February 2, 2011. The City could have also sent the letter concerning the certificate of occupancy at that time or at any time prior to the filing of the administrative

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 30 of 33

complaint and this suit. The City has not offered any explanation as to why the letters needed to be sent within two to three weeks after Oxford House engaged in its protected activities. Thus, the Court will grant summary judgment on the retaliation claim for the Plaintiffs.

VI.

Affirmative Defense of Reliance

The City argues that it has an affirmative defense of reliance on three (3) previous determinations issued by the Louisiana Department of Justice ("LADOJ"), which would bar recovery in this suit. (Df. Ex. T, U, V). In these determinations, the LADOJ investigated complaints that had been filed with HUD, and determined that there were no violations of the Louisiana Equal Housing Opportunity Act or Sections 804f3B of Title VIII of the Civil Rights Act of 1968 as amended by the Fair Housing Act of 1988. In all three of the determinations, the complaints alleged that the City discriminated against the complainants by failing to grant a reasonable accommodation request.

The City argues that the scenarios are factually similar in that the applicants requesting a reasonable accommodation failed to provide sufficient information about the disability/handicap and information about why the requested accommodation was necessary. The City asserts that this demonstrates that the City has not treated the residents of the Oxford Houses any differently from any other group of "allegedly disabled people." (Doc. 88-1 at 20). However, the City also argues that even if this Court finds discrimination, the City "was conducting business in accordance with the instructions of the HUD approved enforcement agency." (*Id.*).

The Court is not persuaded by these findings for a multitude of reasons. First, as Oxford House correctly points out, the City does not cite any law to support this proposition that it was "just following orders," and this justified their conduct in *this* case. Second, even if the City had

cited something to support its reliance theory, it would conflict with the principle that a request for a reasonable accommodation must be assessed individually. "Whether a requested accommodation is required by law is 'highly fact-specific, requiring case-by-case determination.'" *Loren v. Sasser*, 309 F.3d 1296, 1302 (11th Cir. 2002) (citation omitted). The highly fact-specific determination of this case shows that the City should have granted the reasonable accommodation request, regardless of what the City has done in the past. That was both HUD's conclusion and the conclusion of this Court.

<u>42 U.S.C. § 1983</u>

The City argues that Oxford House has failed to show that the City's decision to deny a reasonable accommodation request constitutes a cognizable section 1983 violation. The City asserts that Oxford House has not demonstrated a property interest of which it has been denied and that the City has a "genuine and rational basis" for restricting the number of unrelated people living in an area zoned for single-family use. In opposition, Oxford House asserts that the manner in which the City enforced its code prevented it from operating a group home. Moreover, Oxford House argues that group homes for non-disabled individuals without 24-hour staffing and state licenses are permitted to build a group home in any area of Baton Rouge[9], a classification that Oxford House contends is not rationally related to a legitimate state interest. In response, the City argues that Oxford House's position that only group homes with 24-hour staffing and state licenses are permitted to operate is incorrect. The City contends that had Oxford House provided sufficient information, it could have obtained a reasonable accommodation.

The Court finds that this claim has not been adequately briefed and the Court will deny summary judgment on this claim.

---

[9] Oxford House does not give any support for this argument and the record does not show that a group home for non-disabled individuals would be permitted in any area of Baton Rouge.

Case 3:11-cv-00391-JJB-RLB   Document 111   03/19/13   Page 32 of 33

VII.

For the aforementioned reasons, the Court GRANTS Oxford House's motion for summary judgment, except for the Section 1983 claim (Doc. 82) and DENIES the City's motion for summary judgment. (Doc. 88). Oxford House is hereby ordered to prepare an order for injunctive relief.

Signed in Baton Rouge, Louisiana on March 18th, 2013.

_____

**JAMES J. BRADY, DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**